UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES MICHAEL ALLEN, Plaintiff,<br><br>v.<br><br>KILOLO KIJAKZI,<br>Acting Commissioner of Social Security,<br><br>Defendant. | Case No.:  21cv1271-NLS<br><br>**ORDER:**<br><br>**(1) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT.**<br><br>**(2) GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT.**<br><br>**(3) AFFIRMING THE DECISION OF THE COMMISSIONER**<br><br>**(4) DISMISSING THIS ACTION WITH PREJUDICE**<br><br>**[ECF No. 19]** |

Plaintiff James Michael Allen ("Plaintiff") brings this action under Titles II and XVI of the Social Security Act seeking judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying his application for disability

benefits.  Plaintiff filed a motion for summary judgment, Defendant filed an opposition and cross motion for summary judgment, and Plaintiff filed a reply.  ECF Nos. 14, 17, and 18.

After considering the parties' submissions, the administrative record, and the applicable law, for the reasons stated below, the Court **DENIES** Plaintiff's motion for summary judgment, **GRANTS** the Commissioner's cross-motion for summary judgment, **AFFIRMS** the decision of the Commissioner, and **DISMISSES** this action with prejudice.[1]

## I.  BACKGROUND

### A.  Procedural History

Plaintiff filed applications for Title II disability and Title XVI supplemental security income on May 31, 2019.[2]  In both applications, Plaintiff alleged disability commencing January 1, 2015.  AR 611-14, 615-21.  The Commissioner denied the claims initially on September 12, 2019, AR 505-510, and upon reconsideration on December 2, 2019.  AR 513-19.  On January 20, 2020, Plaintiff requested a *de novo* hearing before an Administrative Law Judge ("ALJ").  AR 520.  The ALJ conducted two oral hearings, the first on August 27, 2020, AR 329-49, and a second supplemental hearing on December 17, 2020. AR 302-328.  The claimant was represented by counsel at both hearings.  AR 304, 331.  A vocational expert was also present at both hearings.  AR 305, 331-332.  On March 2, 2021, the ALJ issued an unfavorable decision denying Plaintiff's request for disability benefits.  AR 29-47.

---

[1] The parties have expressly consented that all proceedings in this case may be heard and finally adjudicated by a magistrate judge. 28 U.S.C. § 646c; Fed. R. Civ. P. 73; ECF No. 5.

[2] Plaintiff filed an earlier application for disability benefits on October 29, 2009.  An ALJ found him not disabled in a prior decision dated July 18, 2011.  That finding raises a rebuttable presumption of continuing non-disability regarding this application.  But the ALJ here found Plaintiff had rebutted the presumption because there had been a change in his age category and substantial new evidence submitted after the prior decision.  Consequently, the ALJ gave no *res judicata* effect to the findings of the prior decision.  AR 33.

On April 22, 2021, Plaintiff requested review of the ALJ's decision. AR 607-610. The Appeals Counsel denied Plaintiff's request for review on June 7, 2021. AR 1-6. On that date, the ALJ's decision became the final decision of the Commissioner, 42 U.S.C. § 405(h). Plaintiff timely commenced this action in federal court.

### B. Plaintiff's Testimony and Self-Reported Symptoms

At the first hearing on August 20, 2020, plaintiff's counsel made an opening statement in which he said that his client was 54 years old in 2015 when he stopped working. AR 336. He had past relevant work as an interstate truck driver and would regularly lift to fifty (50) pounds. *Id.* His client is seeking disability benefits based on both depression and lumbar spine disease. AR 336. The depression limits his ability maintain concentration and pace and causes marked limitations in social functioning. AR 335-336. Additionally, the attorney indicated that his client has degenerative lumbar spine disease that prevents him from doing any work beyond an exertional level of light residual functional capacity. AR 336. He also has diabetes for which he receives medication. AR 337.

Plaintiff testified that his last full-time job as an interstate truck driver ended in 2011 because he was diagnosed with sleep apnea which made him ineligible to drive a commercial truck. AR 337, 341. He also had severe back pain which prevented him from driving on a regular basis. AR 341. Plaintiff testified that in the weeks prior to the hearing, he saw several medical providers, including a spinal surgeon who recommended surgery. AR 342-43. At the time of the hearing, he was getting physical therapy and he was on medication for his back pain. *Id.* He testified that the spinal surgeon told him he had a fracture in his spine. AR 345. The ALJ had no medical records from the prior month so he decided to adjourn the hearing and reschedule it so the updated medical information could be included in the record. AR 345-348.

At the second hearing on December 17, 2020, the ALJ noted that he had received additional records and intended to complete the hearing that day. AR 304. Plaintiff's counsel, Christian Truxal, was present along with a vocational expert, Ms. Bonnie

Sinclair.  AR 304-305.  Plaintiff's attorney indicated that he would provide a more legible copy of claimant's records from The San Diego Pain Consultants, but otherwise the case file was complete.  AR 307-308.

Plaintiff testified that he lives by himself in a "teardrop" trailer that is parked near an apartment complex.  AR 309-310.  He has an older SUV to tow the trailer, but that is not very fuel efficient, so he leaves the trailer where it is parked and travels to his medical and other appointments in the SUV.  AR 310-11.  He receives food assistance but no other benefits.  *Id.*  Prior to the pandemic he would shower at a fitness club.  AR 311-312. He uses restrooms in a nearby park. AR 312.  He has no power in his trailer but gets internet access through his cellphone's hotspot.  AR 314.  He mostly keeps to himself but has a friend who lets him power up his laptop and other devices at her place of business. AR 315.

Plaintiff testified that he cannot sit for long periods of time.  AR 316.  After about 45 minutes he must get up.  *Id.*  He underwent an MRI and his doctor told him he had a fracture in his spine.  AR 317.  The doctor asked him whether he had ever fallen or been rear-ended.  AR 317.  The ALJ noted that the medical records provided from claimant's orthopedic surgeon did not indicate the presence of a fracture in claimant's spine.  *Id.* Plaintiff told his doctor he had a previous fall from a second-floor scaffolding and that he had been rear-ended late at night on Miramar Road.  *Id.*  Regarding his back problems, Plaintiff says he can sit for about an hour after which he will lay on the floor and do an exercise that his physical therapist taught him that helps with the back.  AR 318.  He cannot dead lift anything off the ground.  AR 319.  He is on pain medication for his back pain, but he does not like taking it because it makes him nauseous and nervous.  AR 319. He does take a muscle relaxant.  AR 319.  He has a CPAP machine for his sleep apnea but does not use it as he should because he lacks a power source.  AR 320.  He does not sleep very well even though he has a sleep medication because his trailer gets very cold. AR 321.

//

## C. Testimony by the Vocational Expert

Before asking the vocational expert any questions at the December 17, 2020, hearing, the ALJ noted that even though Plaintiff had some previous work as a truck driver and landscaper, he would assume Plaintiff has no past relevant work based upon his earnings history.  AR 321-322.  So, he gave the vocational expert, Ms. Sinclair, a range of vocational profiles, going from the less restrictive to the more restrictive.  AR 322.  He decided to start with a medium profile and work down from there.  *Id.*  For his first hypothetical, the ALJ asked the vocational expert to assume the following:

Q: I want us to assume we have a person the person's age, educational background, and general experience who is capable of performing medium exertion work per the Dictionary of Occupational Titles[3] but with the following non-exertional limitations.  Our person is limited to frequently climbing ramps and stairs.  Occasionally climbing ladders, but never climbing ropes or scaffolds.  Person can frequently balance, stoop, and crouch, but can only occasionally kneel or crawl.  Person needs to avoid work at unprotected heights or around dangerous, moving machinery.  Pushing and pulling with the lower extremities is limited to occasional.  Person needs to avoid any concentrated exposure to dust, odors, fumes, or pulmonary irritants.  Person is limited for mental health reasons to work involving simple, routine tasks and to no more than occasional interactions with supervisors, co-workers, or the public.  Under that first profile, could you find unskilled work such a person could perform?

A:  Yes, your honor.  That hypothetical individual could work as an industrial cleaner, DOT 381.687-018. SVP 2, unskilled medium.  National, approximately 2.16 million.  That person could work as a packer, DOT 930.5870018. SVP 2, unskilled, National, approximately 705,600.  And that person could also work as a linen room attendant, DOT 222.387-030.  SVP 2, unskilled, medium.  National, 2.1 million.

Q:  Would the industrial cleaner job, would that conflict with the limit I gave to no concentrated exposure to dust, odors, fumes, or pulmonary irritants?  Do they use cleansers with fumes?  I'm just wondering if that's not the best choice, given the profile I gave.

---

[3] Medium work means that in an eight-hour (8) day, a person is working on their feet for six (6) of the eight hours with two 10-minute breaks and sitting for up to two (2) hours.  Medium work means you are required to lift and carry 25 pounds frequently and 50 pounds occasionally.  SSR 83-10.

A: Well, I can give you another one, your [H]onor, although I will say that the industrial cleaner is basically, it's like nothing. It's not a concentrated, like you would get in an industrial environment. But another job that that individual would be able to perform is a laundry worker, DOT 361.684-014. SVP 2, unskilled, medium. National, approximately 208,000.

Q: All right. I'm fully aware that if I bring that profile I just gave you at medium down to light, without past relevant work and given the claimant's age, he would GRID light exertion.[4] So, I'm aware of that possibility, so there's no point in asking for light jobs. Let's stick with the medium profile for now. Let's assume we do have an individual who on a good day could perform one of the four jobs you've cited as examples. But's let's assume this person suffers from mental health issues as well as back pain and some days are better than others. And let's assume this person starts out one of the jobs and does well for a brief period of time but within a couple weeks, really, the employer notices this person is calling in unable to work, and there's a tentative absenteeism of unplanned absences that can't be predicted, missing two full days a month. If a person's missing on a consistent basis two full days a month, could they sustain any of the four jobs at medium you cited as examples?

A: Not in my opinion, your honor. That's based on professional experience.

Q: They couldn't sustain any competitive employment at all in your opinion, is that correct?

A: That's correct.

Q: All right. What if instead, they're pretty good about dragging themselves into work, but let's say there's an average of one day a week where they require extra breaks. Instead of normal breaks, they require two hours of breaktime one day a week. And its unpredictable which day it's going to be, but there's going to be one day each week where the person's out of commission for two hours of the eight-hour shift. Would that be a sustainable situation or would that also make it not possible to sustain the jobs you've mentioned.

A: Not able to sustain.

---

[4] The Grids (Medical Vocational Guidelines), Appendix 2 to Subpart P of Part 404, Code of Federal Regulations, is a recognition by the drafters of the Social Security Regulations that as a worker ages certain medical impairments and limitations make it more difficult for them to adapt and re-tool enough to compete with younger workers. Older individuals are more likely to "grid out" and be eligible for Social Security benefits. See Appendix 2 to Subpart P of Part 404, Sec. 202.

Q: That would be true of all competitive employment?

A: Yes, your honor, based upon professional experience.

Q: And has your testimony been in conflict, I know you are comfortable beyond the DOT for some of the hypotheticals I gave you about absences or extra breaks. But otherwise, has your testimony been fully consistent with the DOT?

A:  Yes, your honor.

AR 321-325.

## D.  Medical and Other Health Care Providers

### 1.  Phong T. Dao, D.O. [Internal Medicine]

On August 12, 2019, Dr. Dao examined Plaintiff at the request of the Social Security Administration.  AR 858-863.  In his report, Dr. Dao noted that Plaintiff was 59 years old, divorced, and a friend drove him to the appointment.  AR 858.  Dr. Dao listed Plaintiff's chief complaints as diabetes, bipolar disorder, and back pain.  *Id*.  Regarding his diabetes, Plaintiff told Dr. Dao he had never been hospitalized for blood sugar issues, nor does he check his blood sugars on a regular basis.  *Id*.  He denied any symptoms of diabetic neuropathy.  AR 859.  Plaintiff reported a history of hypertension, for which he takes medication, but he denied any history of heart attack, shortness of breath or chest pain.  *Id*.

Plaintiff related a history of bipolar disorder with depressed episodes more than manic episodes.  *Id*.  He also indicated he was being followed by a psychiatrist every three months.  *Id*.  He has insomnia as well as decreased memory and concentration.  *Id*. He was hospitalized for depression nine years ago.  *Id*.  He denied any suicidal or homicidal ideation at the time of the appointment.  *Id*.

Plaintiff also told Dr. Dao he had suffered from back pain for many years.   AR 859.  He denied any history of back surgery, and noted the pain is localized in the lumbar

7

region without any radiation. *Id.* He described the pain as an "aching, throbbing, pain." *Id*. It gets worse with prolonged sitting, standing, bending, and lifting. *Id.* At the time of the visit, Plaintiff said he was not taking any prescription pain medication. AR 859. Dr. Dao listed Plaintiff's current medications as including Seroquel, Ambien, Abilify, Lisinopril, and Metformin.[5] *Id.* Dr. Dao noted there were no medical records available for him to review. *Id.*

Dr. Dao performed a complete physical examination of Plaintiff. AR 860-62. In relevant part, Dr. Dao noted Plaintiff's range of motion in the neck was within normal limits. AR 861. The range of motion in Plaintiff's back was likewise within normal limits. *Id.* Dr. Dao noted tenderness to palpation in the paraspinal area of L2-L4. *Id.* A straight leg raising test was negative at 90 degrees, both sitting and supine. *Id.* The range of motion in Plaintiff's upper extremities, wrists and hands was grossly normal bilaterally. *Id.* Range of motion in the lower extremities (hips, knees, and ankles) was normal bilaterally. AR 862. The neurologic examination revealed 5/5 strength in all extremities, intact sensation, normal reflexes, intact cranial nerves, and gait within normal limits. AR 862.

Dr. Dao's impression included the following conditions: diabetes mellitus, hypertension with controlled blood pressure, history of sleep apnea with CPAP therapy, and chronic low back pain secondary to lumbago.[6] AR 862. Dr. Dao concluded his report with a functional assessment that Plaintiff can lift or carry, push, or pull 50 pounds occasionally and 25 pounds frequently. He can stand and walk with no limitations. He

---

[5] Seroquel is used to treat certain mental/mood disorders such as bipolar disorder. https://www.webmd.com/drugs/2/drug-4718/seroquel-oral/details. Ambien is a sleeping pill that is used to treat insomnia. https://www.webmd.com/drugs/2/drug-9690/ambien-oral/details. Abilify is used to treat certain mood disorders such as bipolar disorder. https://www.webmd.com/drugs/2/drug-64439/abilify-oral/details. Lisinopril is used to treat high blood pressure. https://www.webmd.com/drugs/2/drug-6873-9371/lisinopril-oral/lisinopril-oral/details. Metformin is used to control high blood sugar. https://www.webmd.com/drugs/2/drug-11285-7061/metformin-oral/metformin-oral/details.

[6] Lumbago is a seldom used term meant to mean mild to severe low back pain. https://www.spineuniverse.com/conditions/back-pain/lumbago-mild-severe-low-back-pain.

can sit with no limitations.  AR 863.  He has no postural, manipulative, visual communicative or environmental limitations.  *Id.*  He noted his functional assessment was based on his physical examination and observations during the physical examination.  AR 863.

### 2.  M. Mazuryk, M.D. and R. Masters, M.D. [Agency Reviewers]

In September 2019, Doctor Mazuryk, an agency physician, reviewed Plaintiff's medical records.  AR 439.  After reviewing Dr. Dao's report, Dr. Mazuryk noted no new symptoms other than back tenderness with a full range of motion.  He recommended adopting a previous ALJ decision from 2011 that determined Plaintiff was not disabled.  AR 442.  Dr. Mazuryk's functional assessment of Plaintiff at that time was that he could lift/carry 50 pounds occasionally and 25 pounds frequently; stand or walk six hours, push/pull limited only by lift/carry due to sleep related breathing disorders, hypertension, and diabetes mellitus.  AR 445-446.  Dr. Mazuryk further opined that Plaintiff could frequently posture but never climb ladders, ropes, or scaffolds.  AR 446.  He indicated that Plaintiff should avoid unprotected heights or dangerous/moving machinery.  A R 447.  The agency's disability adjudicator explained that Plaintiff's limitations were not severe enough to prevent him from doing his past work as a janitor.  AR 449.  On reconsideration in November 2019 of the agency's disability determination, Dr. Masters agreed that Plaintiff's functional capacity was consistent with Dr. Mazuryk's assessment.  AR 476-496.

### 3.  Neil Tayyab, M.D.

On July 24, 2020, Plaintiff (then 60 years old) saw Dr. Tayyab for a chief complaint of low back pain.  AR 909-911.  He told Dr. Tayyab that he had suffered from low back pain for a least nine (9) years which he felt was secondary to his work as a commercial truck driver.  AR 909.  He also noted a rear-end vehicle accident four years prior that exacerbated his low back pain.  *Id.*  Plaintiff told Dr. Tayyab that the back pain radiates across his waistline and prolonged sitting aggravates the pain.  *Id.*  He said he is unable to sit for more than one (1) hour due to pain.  *Id.*  However, he denied radiating

pain, paresthesia, and weakness in his lower extremities.  *Id.*  Treatment to that point included physical therapy, chiropractic care, massage, and home exercise.  *Id.*  He said his back pain had been manageable when fitness centers were open, but since the pandemic he had been unable to return to the gym.  AR 909.

On examination, Dr. Tayyab found Plaintiff was oriented as to time, place, and person.  His mood and affect were appropriate.  AR 910.  He had good coordination and there was no weakness or sensory deficit.  His deep tendon reflexes were intact.  *Id.*  The lumbar spine examination revealed 5/5 bilateral strength in the lower extremities.  Plaintiff could heel/toe stand without difficulty.  The straight leg test was negative bilaterally.  There were no gross sensory deficits noted.  AR 910.  On examination of the lower back Dr. Tayyab noted mild tenderness over the bilateral paraspinal musculature of the lower spine, but range of motion was unremarkable and there was no gross instability. *Id.*  Strength and tone were normal.  *Id.*  X-rays taken from 7/14/2020 showed a grade 1 spondylolisthesis of L5-S1 with a possible pars defect.[7]  AR 905, 910.

Dr. Tayyab opined that based on the x-rays and his examination, a conservative treatment plan was appropriate.  AR 911.  He recommended a formal outpatient physical therapy program.  *Id.*  He indicated that if the pain worsens or Plaintiff develops radiating pain he should return for further evaluation.  *Id.*  Otherwise he should continue treatment with his primary care provider.  *Id.*

//

## 4. Spine & Sport [Physical Therapy]

---

[7] Spondylolisthesis is a condition where a vertebra slips out of place, resting on the bone below it.  Low grade (I and II) typically does not require surgery.  In older adults wear and tear on the spine and disks can cause this condition.  Lower back pain is the primary symptom.  But other symptoms include difficulty standing or walking for long periods, numbness, tingling or weakness in the foot.  It is commonly treated with medication, steroid injections, physical therapy.
https://my.clevelandclinic.org/health/diseases/10302-spondylolisthesis.  A pars defect, also known as spondylosis, occurs when a crack forms in the bony ring on the back of the spinal column.  This condition mainly affects young athletes although it can occur at any age.  Most patients with a pars defect do not need surgery.  Rather they experience relief with medications, rest, and physical therapy.
https://spinecenterbr.com/pars-defect-condition-and-treatment/.

Plaintiff began physical therapy in August 2020.  AR 919-922.  At that time, his physical therapist noted Plaintiff reported his functional limitations due to back pain include sitting for more than one (1) hour and standing more than 45 minutes.  AR 921.  The treatment plan included six (6) weeks of physical therapy, twice weekly.  AR 921.  Plaintiff's stated goals were to be able to return to work and "working out" without pain.  AR 922.

A progress note from August 2020 indicates Plaintiff presented with groin pain and upper back pain in addition to his low back pain.  AR 927-930. The assessment at that time noted mild strength impairments in the left lower extremity, impaired posture, and increased upper back pain with computer work.  AR 929.  On August 14, 2020, he reported "feeling good overall."  AR 931.  On August 19, 2020, Plaintiff reported severe pain in his upper back.  AR 935.  On September 1, 2020, he reported increased neck pain with working.  AR 943.  On September 11, 2020, he reported "increased neck and upper back pain with working."  AR 951.  On September 15, 2020, Plaintiff reported he was "having a bad day with his back," but generally he noted 50% improvement in pain since the start of physical therapy in terms of frequency and intensity and working out.  AR 955.  On September 18, 2020, Plaintiff stated "he's having a good day with minimal usual pain."  AR 959.  Most of the pain was in his upper back.  *Id.*

### 5.  Shafi Khalid, M.D. [San Diego Pain Consultants]

Plaintiff began treatment with Dr. Khalid on August 20, 2020, for neck pain and low back pain.  AR 970.  Dr. Khalid assessed Plaintiff as having symptoms consistent with cervical radiculopathy as well as lumbar spondylolthesis.  AR 972.  Although he had normal cervical spine movements, functional testing for "foraminal compression" showed a positive Spurling's sign and a positive "reverse" Spurling's sign.[8]  Regarding the lumbar spine, the examination was normal, except for some localized tenderness.

---

[8] Spurling's sign is a provocative test in which the doctor moves the neck in various directions to see if he can evoke pain.  It is a test used to diagnose nerve root compression.  https://www.webmd.com/back-pain/what-is-spurling-test.

Plaintiff's straight leg raising test was negative.  AR 971.  Dr. Khalid referred Plaintiff for EMG studies to investigate possible radiculopathy.  *Id*.  The EMG studies were consistent with a bilateral C6 radiculopathy.  AR 965.  On October 9, 2020, Plaintiff reported his neck symptoms as "moderate and gradually worsening."  AR 974.  He said the symptoms are exacerbated by turning his head right and left as well as up and down. *Id*.  However, he also reported he is complying with his physical therapy and can do activities of daily living with limitations, work with limitations, do housework and sports with limitations.  *Id.*  He further indicated that the impact of his condition emotionally and work-wise was "mild."  *Id.*  On December 9, 2020, after examining Plaintiff and reviewing his chart notes, Dr. Khalid prescribed additional physical therapy, pain medication, and a cervical epidural steroid injection.  AR 975.

### 6.  Family Health Centers of San Diego

On June 2, 2018, Plaintiff received a mental health evaluation and care from the Family Health Centers of San Diego.  AR 793-798.  He was evaluated by Dr. Nusha Nouhi, PhD.  AR 798.  He presented seeking psychiatric medication for memory difficulties, anger issues, depression, and anxiety.  He stated he had no energy.  AR 793. He reported good compliance with Wellbutrin, Seroquel, and Adderall.  AR 795.  Dr. Nouhi noted Plaintiff's hygiene was poor, his speech was normal, his thought process coherent, his behavior cooperative, his affect appropriate, his vocabulary age appropriate, his mood anxious, his memory poor, his judgment age appropriate, and his insight limited.  AR 796.  He was diagnosed as having unspecified anxiety disorder, recurrent major depressive disorder without psychosis, and unspecified trauma/stress related disorder.  *Id.*  Dr. Nouhi's treatment plan included a medical evaluation with psychiatry, a physical exam, and a referral for homeless services.  AR 797.  Depression screening in October 2018 described Plaintiff as having no complaints.  AR 815.

### 7.  Disability Help Center

On May 13, 2019, Dr. Tartaglione completed a "check the box" Mental Impairment Residual Function Capacity Questionnaire regarding Plaintiff.  AR 803-808.

He noted a variety of problems including pervasive loss of interest in most activities, appetite disturbance, thoughts of suicide, feelings of worthlessness, poverty of speech content, mood disturbance, difficulty thinking or concentrating, psychomotor agitation or retardation, personality change, emotional withdrawal or isolation, and sleep disturbance. AR 804.  In evaluating Plaintiff's ability to do work-related activities on a day-to-day basis, Dr. Tartaglione completed a "check the box" grid regarding Plaintiff's ability to do unskilled work that indicated Plaintiff had serious limitations but was not precluded from: 1) maintaining regular attendance, 2) understanding and remembering short and simple instructions, 3) sustaining an ordinary routine without special supervision, 4) working with others without being unduly distracted, 5) getting along with co-workers, 6) responding appropriately to changes in routine, and 7) being aware of hazards and taking appropriate precautions.  AR 805.

Regarding to other mental/emotional capabilities, Dr. Tartaglione opined that Plaintiff was unable to meet competitive standards for 1) carrying out short and simple instructions, 2) maintaining attention for two-hour segments, 3) making simple work-related decisions, 4) completing a normal workday and week without interruption from psychological symptoms, 5) asking simple questions or requesting assistance, 6) accepting instructions or criticism from supervisors and dealing with normal work stress.  *Id*.  Dr. Tartaglione also reported that Plaintiff has moderate restrictions in his activities of daily living, marked difficulties in maintaining social functioning, extreme difficulties in maintaining concentration, persistence, or pace, and three episodes of decompensation within a 12-month period, each of at least two weeks duration.  AR 807. He further opined that Plaintiff's mental impairments would cause him to be absent from work more than four days per month, his impairments could be expected to last at least twelve months, and his patient was not a malingerer.  AR 808.

### 8.  Psychiatric Centers at San Diego (PCSD)

On November 26, 2019, Plaintiff presented to PCSD for a psychiatric diagnostic evaluation.  AR 897-903.  In the history section of the report of that evaluation, the

provider notes that Plaintiff has a history of severe insomnia, but he has been successfully managed for that condition with ambien for over 20 years.  He can sleep a full eight hours, and his energy and functioning are good when on it.  AR 897.  He reported a history of ADHD with muddy thinking and inability to concentrate.  He tried medications but they did not help.  He also reported his ADHD and mood swings have mellowed with age.  *Id.*  He told the provider that he stopped using his CPAP machine a year prior because he sleeps well enough with ambien.  He was prescribed valium as needed for anxiety and continued ambien for sleep.  AR 898.  The provider noted "[t]oday he presents as calm, able to converse, positive outlook."  *Id.*  His mental status was anxious, his speech clear, his thought process clear, his perception within normal limits, his thought content clear, intelligence average, insight within normal limits, and judgment within normal limits.  AR 900.  There was no evidence of hallucinations or delusions.  *Id.*  His attention and ability to abstract were impaired.  *Id.*  The provider diagnosed an unspecified anxiety disorder for which valium and Ambien were prescribed.  AR 901.

On January 8, 2020, Plaintiff went for a follow-up visit with PCSD.  AR 892-96.  The provider noted Plaintiff reported his sleep is much improved since receiving ambien.  AR 892.  He can concentrate, focus, think more clearly since sleeping well.  *Id.*  His energy level is normal.  He has been attending Bible study and occasionally takes valium for anxiety reduction.  *Id.*  His general mental status at that time was described as "normal."  AR 894.  Although his mood was "anxious" his affect was full, his speech clear, his thought process logical, his thought content was within normal limits, he had no delusions, there was some impairment of attention/concentration and ability to abstract, his intelligence was average, with insight and judgment within normal limits.  AR 894.  He was diagnosed with insomnia and an unspecified anxiety disorder.  *Id.*

He had a telephonic follow-up visit on April 6, 2020.  AR 887-891.  He told the provider he could not attend to his personal hygiene because the fitness club and parks are closed due to Covid-19.  AR 887.  But valium was helping reduce his anxiety.  *Id.*  Again, his mental status exam was generally normal, except for a depressed/anxious

mood.  AR 889.  He was prescribed ambien for sleep.  AR 890.  Plaintiff had another

follow-up telephone appointment on May 6, 2020.  AR 882-86.  At that visit Plaintiff said

he had not showered in a month and lived in a "tear-drop" trailer.  He told the provider he

goes for daily walks and is homeless.  AR 882.  He reported that his family disowned

him, but he does not know why.  He is a handyman, painter, and does janitorial work.  *Id.*

He registered for Job Corps but has not heard from them.  *Id.*  He is afraid to go to

shelters for fear of the virus.  He needs to be around other people.  *Id.*  His mental status

exam was essentially normal although his mood was depressed and anxious.  AR 884.

He was told to continue taking his medications and return for supportive care.  AR 885.

## II.  SUBSTANCE OF THE ALJ'S DECISION

At step one of the sequential process, the ALJ found that Plaintiff had not engaged

in substantial gainful activity since January 1, 2015, the date of his application for

benefits.  AR 35.  At step two, the ALJ found Plaintiff 's obstructive sleep apnea and

incipient degenerative disc disease were severe impairments that significantly limited his

ability to perform basic work activities.  *Id.*  While there was evidence in the record of

other medically determinable impairments of hypertension, diabetes, and borderline

obesity, the ALJ determined these conditions were managed medically and considered

singly or in combination did not cause more than minimal limitation in his ability to

perform basic work activities, so they were therefore non-severe.  AR 36.

Additionally, the ALJ found that Plaintiff's medically determinable mental

impairments of mood disorder with depressive and bipolar traits; anxiety disorder, and

post-traumatic stress disorder ("PTSD"), with insomnia caused no more than minimal

limitation in Plaintiff's ability to perform basic mental work activities and are therefore

non-severe.  In making that finding, the ALJ noted he had considered the four broad

functional areas set out in the disability regulations for evaluating mental disorders

known as the "Paragraph B" criteria.  The first functional area is understanding,

remembering, or applying information.  While Plaintiff reported an inability to follow

instructions or directions verbally, his mental status examinations throughout the record

were within normal limits.  AR 36.  The record showed improvement in his mental condition and symptoms with medication.  *Id.*  The ALJ concluded the record supports no more than a mild limitation in this area.  *Id.*

The second functional area is interacting with others.  Again, the ALJ found the Plaintiff has only a mild limitation in this area.  AR 36.  While Plaintiff reported deficits in social interaction in his adult function report, he said he goes grocery shopping on the weekend and goes to church on Sundays, which indicates some social interaction.  The ALJ again noted that Plaintiff's mental status examinations were within normal limits and his mental conditions and symptoms improved with medication.  *Id.*

The third functional area is concentrating, persisting, or maintaining pace.  In this area, the ALJ found Plaintiff had no more than a mild limitation, again citing the normal mental status examinations and improvement with medication.  AR 37.

The fourth functional area is adapting or managing oneself.  The ALJ found Plaintiff had no more than a mild limitation in this area.  He reported his living situation exacerbates his condition such that he is isolated and feels anxious around crowds AR 37.  Yet, in his adult function report, Plaintiff said that during the day, he would walk to the public showers and spend time at the library.  He also went grocery shopping on the weekend.  *Id.* AR 677-84.  He lives independently and performs all his necessary activities of daily living.  *Id.*[9]

At step three, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  AR 37.

Next, the ALJ determined that Plaintiff retained the RFC to perform medium work

---

[9] Because his mental impairments cause no more than "mild" limitation in any of the functional areas, they are non-severe.  *Id.* The ALJ went on to observe that the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.  The mental residual functional capacity assessment used at steps 4 and 5 requires a more detailed assessment.  AR 37.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

as defined in 20 C.F.R. § 404.1567c and 416.967c[10] except:

> [H]e is limited to frequently climbing ramps or stairs; occasionally climbing ladders; never climbing ropes or scaffolds; frequently balancing, stooping or crouching; occasionally kneeling or crawling; must avoid work at unprotected heights or around dangerous moving machinery; limited to occasional pushing and pulling with the lower extremities; and must avoid concentrated exposure to dust, odors, fumes or pulmonary irritants.

AR 38.  In making his RFC assessment, the ALJ noted he had considered all of Plaintiff's symptoms as well as the medical opinion evidence.  *Id.*

At step four, the ALJ determined that Plaintiff had no past relevant work.[11]  AR 40. At step five, the ALJ noted he must consider the Plaintiff's age, education, work experience, and residual functional capacity in conjunction with the Medical-Vocational Guidelines, 20 C.F.R. § 404, Subpart P, Appendix 2, to determine whether there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.  AR 41.[12]  The ALJ noted that while Plaintiff was 54 years old on the date he alleged the onset of disability, at the time of the hearing he had changed age category to a person "closely approaching retirement age."  20 CFR § 404.1563 and 416.963.  He had at least a high school education.  AR 40.  Transferability of job skills was not an issue because Plaintiff did not have past relevant work.  AR 41.  The ALJ found, after considering the testimony of the vocational expert, and the Medical-Vocational Guidelines that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, specifically: Industrial Cleaner (medium exertional level, unskilled, SVP 2), Packer (medium exertional level, unskilled, SVP 2), Linen Room Attendant (Medium exertional level SVP 2) and Laundry Worker (medium exertional level, unskilled, SVP 2).  AR 41.

---

[10] Medium work means the ability to lift and carry [fifty] pounds occasionally and 25 pounds frequently.  20 C.F.R. § 404.1567c and 416.967c.

[11] He had no past relevant work based on his limited earnings history.  AR 321-322.

[12] If the Plaintiff can perform all or substantially all the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile.  If the Plaintiff cannot perform all or substantially all the exertional demands at a given level, then the Medical-Vocational guidelines provide a framework for decision-making.  AR 41.

As such, the ALJ concluded Plaintiff is not disabled as defined in the Social Security Act. AR 42.

### III.  LEGAL STANDARD OF REVIEW

The Social Security Act provides for judicial review of a final agency decision denying a claim for disability benefits.  42 U.S.C. § 405(g).  A reviewing court will set aside a denial of benefits only when the ALJ decision is "based on legal error or not supported by substantial evidence in the record."  *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (*quoting Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir. 2003)).  Substantial evidence is "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019); *see Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012) (quotation and citation omitted).  It is a "highly deferential" standard of review.  *Valentine v. Astrue*, 574 F.3d 685, 690 (9th Cir. 2009).  However, the Court must consider the entire record, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and it "may not affirm simply by isolating a specific quantum of supporting evidence."  *Garrison v. Colvin*, 759 F3d. 995, 1009 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue,* 504 F.3d 1028, 1035 (9th Cir. 2007)).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities."  *Vasquez v. Astrue*, 547 F.3d 1101, 1104 (9th Cir. 2008) (internal quotations and citation omitted).  If the evidence is susceptible to more than one reasonable interpretation, the agency's decision must be upheld.  *Molina*, 674 F.3d at 1111.  It is not the Court's role to reinterpret or re-evaluate the evidence, even if a re-evaluation may reasonably result in a favorable outcome for the plaintiff.  *Batson*, 359 F.3d at 1193.  Moreover, the Court may not uphold an ALJ's decision on a ground not actually relied on by the ALJ.  *Molina*, 674 F.3d at 1121.

### IV.  DISCUSSION

Plaintiff argues that the ALJ erred in three respects: (1) he did not consider

Plaintiff's cervical disc disease in determining Plaintiff's residual functional capacity; (2) his finding of a "non-severe" mental impairment is not supported by substantial evidence; and (3) he did not state "clear and convincing reasons" for rejecting the Plaintiff's testimony regarding the severity of his symptoms and limitations.  The court is not persuaded by these arguments.

### A.  The ALJ Properly Considered Both Plaintiff's Lumbar and Cervical Impairments in Determining Plaintiff's Residual Functional Capacity (RFC).

Plaintiff contends the ALJ and Drs. Dao, Mazuryk, and Masters did not consider his cervical disc disease, right foraminal stenosis (AR 976) or cervical radiculopathy in determining his residual functional capacity.  ECF 14 at 9.  Plaintiff argues the ALJ should have made a separate residual functional capacity assessment going forward from August 2020 after he sought treatment for neck pain, citing *Smith v. Kijakazi*, 14 F. 4th 1108, 1108-1112, (9th Cir. 2021).  *Smith* was a mental health case in which the claimant suffered a severe grief reaction to the deaths of his fiancée, mother, and grandmother during a two-month period in 2012.  *Id.* at 1110.  The record showed the claimant's symptoms varied during the years following his family members' deaths, but dramatically improved during the later years of the disability period.  *Id.*  The ALJ found that Smith was not disabled, but the Ninth Circuit reversed and remanded.  It held that the ALJ erred in disregarding Smith's subjective testimony because she only focused on those symptoms he testified to at the hearing in 2018, rather than symptoms that may have rendered him disabled during an earlier period after the deaths.  *Id*. at 1111-1113.  The Ninth Circuit noted "it may be that Smith was disabled for a qualifying portion of the time from his alleged onset date, even if not for the full period."  *Id.* at 1114.

Here, unlike in *Smith*, the record did not establish any "dramatic" change in Plaintiff's back pain.  Rather, Plaintiff's back pain was long standing and chronic.  When Plaintiff first sought treatment for neck pain in August 2020, he reported to Dr. Khalid that the onset of that pain had been "gradual" over five (5) years.  AR 965, 970.  While

the focus of Plaintiff's symptoms may have shifted somewhat to the cervical spine between August 2020 and December 2020, his residual functioning did not change significantly.  Before August 2020, every physician who offered an opinion regarding Plaintiff's RFC found he could perform a range of functioning consistent with a medium exertional (with limitations) RFC.  AR 39-40, 445-447, 478-80, 863.  Dr. Dao, an examining physician, concluded that Plaintiff could perform medium exertional work and had no postural or environmental limitations.  AR 39-40, 858-863.  Dr. Mazuryk and Dr. Masters separately reviewed Plaintiff's medical records and each separately concluded that Plaintiff could perform a restricted range of medium work.  AR 445-44, 476.

Notably, after August 2020, even Dr. Kahlid who diagnosed Plaintiff as having foraminal stenosis and a C6 radiculopathy, AR 967-968, did not note any significant change in Plaintiff's functional capacity.  In fact, Plaintiff reported to Dr. Khalid in August 2020 that he was able to do activities of daily living with limitations, able to work with limitations, and able to do housework and sports (with limitations).  AR 970.  He further indicated that the impact of his condition emotionally and work wise was "mild." AR 965.  Dr. Khalid continued a conservative course of treatment with pain medication and physical therapy.  AR 964.  That treatment continued through December 2020, when Dr. Khalid ordered a cervical epidural steroid injection as well, but otherwise conservative treatment remained the same.  AR 974-976.

The medical records consistently revealed Plaintiff had both limitations and residual functioning.  AR 39.  Plaintiff had muscle tenderness and on two occasions presented with an antalgic gait.[13]  AR 39, 910 (mild tenderness), 968 (antalgic gait), 971 (antalgic gait).  However, Plaintiff's physical examinations were otherwise unremarkable. AR 39.  On multiple occasions, Plaintiff presented with a normal gait and no tenderness. He also had normal range of motion throughout his upper and lower extremities; good

---

[13] An "antalgic gait" is a limp that is caused by pain in the lower limbs. https://www.webmd.com/pain-management/what-is-antalgic-gait.

muscle tone; intact sensation, normal reflexes; normal posture and motor movements; and his straight leg raising test was negative.[14]  AR 36-37, 39, 311, 313-314, 679-81, 882.

Despite his impairments Plaintiff consistently maintained a relatively active lifestyle.  AR 36-37, 39, 313-314, 679-81, 882.  He lived independently, walked daily, went to the gym to exercise and shower, went to church on Sunday, grocery shopped, used public transportation, and attended medical appointments.  *Id.*  The ALJ properly found that Plaintiff's demonstrated capabilities were consistent with his RFC.  As late as December 2020 Plaintiff reported to Dr. Khalid that he "feels well with minor complaints and slightly worse."  AR 963.  At that appointment he reported being able to do his activities of daily living, work, do housework and sports, with limitations.  AR 974.

As the Commissioner correctly points out, a person's RFC is an administrative, not medical finding.  ECF 17 at 3. The ALJ must determine RFC based on all the relevant evidence in the record, not just medical opinion evidence.  *Id.*  Here, the ALJ considered all the evidence, including medical evidence and prior administrative findings in determining Plaintiff's RFC.  AR 38-40.  Based on all the relevant evidence in the record, the ALJ's RFC finding was proper and supported by substantial evidence.

**B. The ALJ's finding of a non-severe mental impairment is supported by substantial evidence.**

Plaintiff argues the ALJ erred in finding Plaintiff's mental impairment is not severe.  ECF 14 at 11-12.  Plaintiff contends that the ALJ's reference to normal mental status examinations throughout the record is insufficient to make that finding.  *Id.*  Plaintiff asserts his symptoms "continued to wax and wane," but he still suffered from depression and anxiety into August of 2020, and the record does not show he was getting better.  *Id.* AR 914-15.  In his Reply brief, Plaintiff cites to a variety of symptoms he had in April 2018 such as feeling down, depressed, or hopeless nearly every day; trouble falling and staying asleep; feeling like a failure or having let his family down; trouble

---

[14] The straight leg test is a mechanical maneuver that a physician uses to look for disc herniation and lumbosacral nerve root irritation. https://www.webmd.com/back-pain/what-is-straight-leg-raise-test.

concentrating nearly every day.  ECF 18 at 4, AR 835.  He had poor hygiene, poor memory, inability to concentrate, fair judgment, and limited insight.  AR 796.  Mental status exams were benign in October and December 2018 (AR 815, 782), but Plaintiff continued to have symptoms for which medication was ineffective.  AR 779.  Plaintiff notes that in May 2019, Family Health Centers classified him as a moderate suicide risk and added trazodone to his medications despite a normal mental status exam.  ECF 18 at 4, AR 771-72.  In November 2019 and January 2020, Plaintiff presented with an anxious mood.  AR 894, 900.  In May and August 2020, he still had a depressed and anxious mood.  AR 884, 915.  He continued to have trouble sleeping.  AR 923.  Plaintiff argues that these symptoms and changes in medications do not permit "the bland conclusion of a "non-severe."  ECF 18 at 4.

The Commissioner contends the ALJ properly found Plaintiff did not have a severe mental impairment.  ECF 17 at 7-11.  First, he asserts that the great majority of Plaintiff's mental status examinations revealed intact functioning in key areas of cognitive and social function.  Plaintiff's attention span, concentration, memory (both recent and remote), thought processes, insight and judgment were all intact; his associations, thought content, and fund of knowledge were all normal; he had average intelligence; his cognition was within normal limits; he was awake and alert; properly groomed, made normal eye contact, demonstrated normal and cooperative behavior, and had normal, even articulate speech.  AR 36 (citing AR 771, 775, 779, 786-87, 830, 832, 884, 889, 916).[15]

Second, his longitudinal treatment records indicated he was able to manage any mental symptoms with treatment.  AR 36, 39, 743, 756, 799, 820, and 892.  Dr. Lira

---

[15] Dr. Taraglione's opinion was properly discounted by the ALJ because it was inconsistent with Plaintiff's many normal mental status examinations, his improvement with medication, and his demonstrated capabilities, as well as the prior administrative findings from two mental health practitioners, M. Koretzsky, PhD and Robert Liss, PhD both of whom specialize in evaluating a person's mental RFC.  AR 40, 442-43, 477.  Both doctors reviewed Plaintiff's records and concluded the record did not establish a severe mental impairment.  *Id.*

noted Plaintiff's sleep apnea was properly controlled with his CPAP.  AR 39, 756.  As for his mood disorder, anxiety, and other symptoms, Plaintiff appeared to be dealing with his symptoms effectively with medication.  On July 18, 2018, over three years after the alleged onset of his disability, Plaintiff reported being on medication "with good effect."  AR 36, 799.  On August 24, 2018, treating provider Claudia Chappro, R.N.R., found that Plaintiff was improving on medication and made no changes to his medication.  AR 36, 820.  On January 8, 2020, Plaintiff reported his sleep was "much improved" with medication.  AR 36, 892.  He said he could concentrate, focus, and think better and that his energy levels were "normal."  AR 892.  He presented as "calm, "stable" and "adjusted."  AR 892.

Third, the Commissioner points out that Plaintiff's demonstrated capabilities do not support the presence of a severe mental impairment.  AR 36-37, 39; *see, e.g.*, 311, 313-314, 679-81, 882.  Plaintiff regularly engaged in activities that involved interaction with others, energy, and cognitive capabilities.  AR 36-37, 39.  Plaintiff lived independently and among his activities of daily living, Plaintiff went on daily walks, went to the gym, went to church, went grocery shopping, and used public transportation.  AR 311, 313-314, 679-81, 882.  The ALJ reasonably found the Plaintiff's demonstrated capabilities did not evidence a severe mental impairment.

The fact that Plaintiff still had depression and anxiety in 2020 despite being on medication does not undercut the ALJ's findings.  On examination at Psychiatric Centers of San Diego on August 26, 2020, his presentation was normal, albeit with depressed and anxious mood, but he maintained a cooperative attitude, retained clear speech, logical thought processes, normal perception, normal thought content, normal cognition, average intelligence, normal insight and judgment.  AR 916.  He did not express any suicidal or homicidal ideation, plan, intent, or attempt.  *Id.*  The provider's note states in pertinent part "Pt presents as functioning, able to concentrate, focus.  He is managing with meds, he makes good decisions, stays safe and so far, is able to take care of self."  AR 914.

1    It is undisputed that Plaintiff had a medically determinable mental impairment

2  throughout the alleged disability period.  AR 36. But the ALJ properly concluded that the

3  weight of the evidence--the prior administrative findings, Plaintiff's mental-status

4  examinations, the efficacy of medication, and Plaintiff's demonstrated capabilities--

5  indicated that despite his impairments, he was able to maintain intact mental functioning.

### C.  The ALJ Properly Weighed Plaintiff's Subjective Complaints

7    Plaintiff argues that the ALJ erred in discounting his subjective symptoms and

8  limitations testimony.  ECF 14 at 13-15.  The Commissioner contends that the ALJ

9  properly applied the two-step process in considering Plaintiff's alleged symptoms and

10  made findings that are properly supported by the record.  ECF 17 at 11-14.

11    Both the Act and the regulations prohibit granting disability benefits based solely

12  on a claimant's subjective complaints.  42 U.S.C. § 423(d)(5)(A) ("[a]n individual's

13  statement as to pain or other symptoms shall not alone be conclusive evidence of

14  disability"); 20 C.F.R. § 404.1529(a) ("statements about your pain or other symptoms

15  will not alone establish that you are disabled").  As one court observed, the ALJ "is not

16  required to believe every allegation of disabling pain, or else disability benefits would be

17  available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)."  *Fair v.*

18  *Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

19    The Ninth Circuit has established a two-step process to determine whether a

20  claimant's testimony about subjective pain is credible.  *Kramer v. Kijakazi*, Case No.

21  20cv2065-GPC (AHG), 2022 WL 873630 *11 (S.D. Cal. March 24, 2022) (*citing*

22  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-1036 (9th Cir. 2007)).  First, the ALJ must

23  determine whether the claimant provided objective evidence of an impairment or

24  impairments that could reasonably be expected to produce the alleged pain or symptoms.

25  *Id.* at 1036.  Second, if the first factor is met and there is no evidence of malingering, "the

26  ALJ can reject the claimant's testimony about the severity of her [his]symptoms only by

27  offering specific clear and convincing reasons for doing so."  *Id.*

28    "While subjective pain testimony cannot be rejected solely on the ground that it is

not fully corroborated by objective medical evidence, the medical evidence is nevertheless a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Kramer*, 2022 WL 873630 *11 (*citing Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001)).  "In evaluating the claimant's testimony, the ALJ may use 'ordinary techniques of credibility evaluation.'  For instance, the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct, . . . and 'whether the claimant engages in daily activities inconsistent with the alleged symptoms.'" *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

Following the two-step process, the ALJ determined first that Plaintiff's medically determinable impairments (*i.e.*, obstructive sleep apnea, incipient degenerative disc disease, and depression) could reasonably be expected to cause some of his alleged symptoms (*i.e.*, back pain, inability to stand or sit for long periods of time, inability to focus and follow instructions, difficulty with social interaction).

Having satisfied the first step of the process, the ALJ next found that Plaintiff's allegations concerning the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the objective medical evidence in the record.  AR 38-40. For example, Plaintiff's complaints of inability to concentrate and focus (AR 677, 686) are contradicted by the mental status examinations by his treating providers that generally found intact concentration and attention (AR 771, 775, 779, 820).  Whereas Plaintiff complained of an inability to follow instructions, mental status examinations recorded intact and linear thought processes and intact recent and remote memory. *Id.*  While Plaintiff complained of difficulty with social interactions, his medical providers reported his behavior as normal, cooperative, and pleasant.  He had normal eye contact, normal and articulate speech, and on most occasions presented with appropriate grooming.  AR 770 774, 787, 796 830, 832, and 884.

Plaintiff's physical examinations likewise failed to substantiate his claims of difficulty standing and sitting due to back pain.  Rather, he presented in no acute distress, had good muscle tone in his bilateral upper and lower extremities with good active range

of motion and full strength; he had normal range of motion in his back; and his straight leg raising test was negative in both the sitting and supine positions. AR 739, 741, 743, 745, 747, 749, 751, 861-62, 910. Plaintiff refers to evidence of an "antalgic" gait (ECF 14 at 15), but that evidence was expressly considered by the ALJ along with all the other many instances where he presented with a normal gait. AR 39, 739, 743, 749, 753, 826, 861-62, 883, 888, 893, 915, 968, 966, 971.

Plaintiff's conservative course of treatment was similarly inconsistent with the extreme limitations he alleged. AR 18. The treating notes indicate he was able to manage his pain with conservative treatment through medications, massage, physical therapy, and home exercise. *Id.*; *see Johnson v. Shalala,* 60 F.3d 1428, 1434 (9th Cir. 1995) (conservative course of treatment suggested "a lower level of both pain and functional limitation"). In 2020, for example, Plaintiff told Dr. Tayyab that he had suffered from back pain for nine years and treatment to that point included physical therapy, chiropractic care, massage, and home exercise. AR 909. He said his back pain had been manageable when fitness centers were open, but since the pandemic he had been unable to return to the gym. *Id.* On September 15, 2020, Plaintiff told his physical therapist he was "having a bad day with his back," but generally he noted 50% improvement in pain since the start of physical therapy in terms of frequency and intensity and working out. AR 955. On September 18, 2020, Plaintiff stated "he's having a good day with minimal usual pain." AR 959.

The ALJ properly found Plaintiff's demonstrated capabilities also undercut his claims of disabling back pain and limitations caused by neck pain. Although Plaintiff reported having "little to no energy" he lived an active lifestyle. AR 38, 670. He went on daily walks, went to the gym, went to church, went grocery shopping, took public transportation, and performed all the necessary tasks associated with independent living. AR 36-37, 39, 311, 313-14, 679-81, 882. The neck symptoms he reported to Dr. Khalid did not prevent him from doing activities of daily living, work, housework, and sports,

with limitations.  AR 974.  Plaintiff described the impact of his condition emotionally and work wise was "mild."  *Id.*

In sum, the Court concludes that the ALJ provided specific, clear, and convincing reasons to discount Plaintiff's symptom testimony.  Where, as here, the evidence is susceptible to more than one reasonable interpretation, the agency's decision must be upheld.  *Molina*, 674 F.3d at 1111.  It is not the Court's role to re-evaluate the evidence, even if a re-evaluation may reasonably result in a favorable outcome for the plaintiff. *Batson*, 359 F.3d at 1193; *see also Thomas*, 278 F.23d at 959 ("[i]f the ALJ's credibility finding is supported by substantial evidence in the record, we may not engage in second-guessing.").

## IV.   DISPOSITION

For the foregoing reasons, the Court finds the Commissioner's final decision is supported by substantial evidence and free of legal error.  Accordingly, the Court **DENIES** Plaintiff's motion for summary judgment, **GRANTS** Defendant's cross-motion for summary judgment, **AFFIRMS** the decision of the Commissioner and dismisses the action with prejudice.  The Clerk of the Court shall enter judgment in accordance with this Order.

**IT IS SO ORDERED.**

Dated:  March 9, 2023

Hon. Nita L. Stormes
United States Magistrate Judge